**RECORD NOS. 11-7096(L), 12-7025, 12-7026**

ORAL ARGUMENT HELD ON JANUARY 23, 2013

In The

# United States Court of Appeals

### For The District of Columbia Circuit

# DAVID L. de CSEPEL; ANGELA MARIA HERZOG; JULIA ALICE HERZOG,

*Plaintiffs – Appellees/Cross-Appellants*,

**v.**

# REPUBLIC OF HUNGARY, a foreign state; THE HUNGARIAN NATIONAL GALLERY; THE MUSEUM OF FINE ARTS; THE MUSEUM OF APPLIED ARTS; THE BUDAPEST UNIVERSITY OF TECHNOLOGY AND ECONOMICS,

*Defendants – Appellants/Cross-Appellees*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

_____

## APPELLANTS' MOTION TO STAY THE COURT'S MANDATE PENDING DISPOSITION OF PETITION FOR WRIT OF CERTIORARI

_____

*Thaddeus J. Stauber
Sarah E. André
NIXON PEABODY LLP
Gas Company Tower
555 West Fifth Street
Los Angeles, California  90013
(213) 629-6000

D. Grayson Yeargin
Emily C. Harlan
NIXON PEABODY LLP
401 Ninth Street, N.W., Suite 900
Washington, D.C.  20004
(202) 585-8000

*Counsel for Appellants/Cross-Appellees*          *Counsel for Appellants/Cross-Appellees*

Hungary hereby moves for a stay of the Court's mandate pending disposition by the United States Supreme Court of Hungary's Petition for a Writ of Certiorari. A stay of the mandate is warranted under Federal Rule of Appellate Procedure 41(d)(2) and D.C. Circuit Rule 41(a)(2) based on the substantial questions presented, as this Court's decision fails to apply well-established Supreme Court precedent and creates (or furthers) circuit splits that mandate Supreme Court review. In addition, good cause exists for the stay because Hungary will suffer irreparable harm if forced to submit to the jurisdiction of a U.S. court before the Supreme Court has an opportunity to review whether Hungary can (and should) be stripped of its presumptive immunity. Finally, this Court's expansive reading of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330 *et seq*., and the international implications of this Court's decision warrant closer examination by the Supreme Court. Plaintiffs' counsel has informed Hungary's counsel that Plaintiffs will oppose this motion.

## DISCUSSION

This action involves the interpretation of (1) international agreements (addressing World War II and Communist-era reparations) and (2) the FSIA (recognizing that Hungary is presumptively immune from the jurisdiction of U.S. courts), and the determination as to whether they bar this Court from taking jurisdiction over Hungary for actions that allegedly took place decades ago, in a

foreign country, where two of the three plaintiffs are non-U.S. citizens with no

identified connection to the United States.

## I.    Procedural History

On July 27, 2010, David de Csepel, grandson of Erzsébet Weiss de Csepel

and nephew of Martha Nierenberg, and Julia and Angela Herzog, the Italian-citizen

daughters of András Herzog, filed their Complaint in this action.  On February 15,

2011, Hungary moved to dismiss Plaintiffs' Complaint.  Hungary sought dismissal

on several grounds, including that Plaintiffs' claims were barred by: (1) Hungary's

immunity from suit under the FSIA; (2) principles of international comity; (3) the

doctrine of *forum non conveniens*; (4) the District of Columbia's statute of

limitations; (5) the political question doctrine; (6) the non-cognizability of

Plaintiffs' bailment claim; and (7) the act of state doctrine.

On September 1, 2011, the district court issued a Memorandum Opinion and

an Order granting, in part, Hungary's motion to dismiss.  *See de Csepel v. Republic

of Hungary*, 808 F. Supp. 2d 113 (D.D.C. 2011).  The district court recognized

Hungary's international comity defense, dismissing eleven of forty-four claims, *see

id*. at 144-45, and denied the remainder of Hungary's motion, *see id.* at 126-44.

On September 12, 2011, Hungary filed a Notice of Appeal, pursuant to 28

U.S.C. § 1291, to challenge the district court's finding that an exception to the

FSIA stripped Hungary of its presumptive sovereign immunity.  On November 30,

2011, the district court, in response to the parties' requests, certified for immediate,

interlocutory appeal all remaining issues raised in Hungary's Motion to Dismiss.

On March 2, 2012, this Court granted the parties' requests to appeal the

issues certified for interlocutory appeal by the district court's Memorandum

Opinion and Order of November 30, 2011. This Court consolidated the three

appeals on March 12, 2012, allowing all arguments raised by Hungary in its

Motion to Dismiss to be heard in one appeal.

On April 19, 2013, this Court issued a decision affirming, in part, and

denying, in part, the district court's decision, rejecting Hungary's comity challenge

as premature. On May 20, 2013, Hungary filed a petition for panel rehearing and

rehearing en banc. This Court denied the petition on June 4, 2013. Hungary

intends to file a petition for a writ of certiorari with the U.S. Supreme Court. That

petition is due on September 4, 2013. Absent a stay by this Court, the mandate is

scheduled to issue on June 11, 2013, and the case will return to the district court

before the U.S. Supreme Court has an opportunity to consider Hungary's petition.

## II.    The Motion Meets the Standards for Staying the Mandate

A motion to stay the mandate pending the filing of a petition for certiorari

should be granted where (1) the petition presents a "substantial question" and

(2) there is "good cause" for a stay. Fed. R. App. P. 41(d)(2); *see also* D.C. Cir. R.

41(a)(2) (requiring that movant for stay of mandate provide "facts showing good

cause for the relief sought"). This Court has employed a less stringent standard under Federal Rule of Appellate Procedure 41(d)(2) and D.C. Circuit Rule 41(a)(2), asking only whether the petition for certiorari "tenders [issues that] are substantial." *Deering Miliken, Inc. v. FTC*, 647 F.2d 1124, 1128 (D.C. Cir. 1978). As guidance, a circuit court considers "the issues that the applicant plans to raise in the certiorari petition in the context of the case history, the Supreme Court's treatment of other cases presenting similar issues, and the considerations that guide the Supreme Court in determining whether to issue a writ of certiorari." *Williams v. Chransi*, 50 F.3d 1358, 1361 (7th Cir. 1995) (per curiam).

To determine whether there is "good cause" to stay the mandate, the circuit court should consider the equities of granting the stay and whether the applicant will suffer "irreparable injury" if the stay is denied. *Nanda v. Bd. of Tr. of the Univ. of Illinois*, 312 F.3d 852, 853 (7th Cir. 2002); *see also Rostker v. Goldberg*, 448 U.S. 1306, 1308 (1980); *Nara v. Frank*, 494 F.3d 1132, 1133 (3d Cir. 2007); *Books v. City of Elkhart*, 239 F.3d 826, 827-28 (7th Cir. 2001). In application, the irreparable injury standard is not difficult to meet, merely requiring that the movant show some harm will ensue absent the stay, or that some public interest supports the stay. *See Books*, 329 F. 3d at 829 (noting that equities favor issuance of stay in cases involving public display of religious material where "public interest is best served [by] affording the [petitioner] City a full opportunity to seek review in the

Supreme Court of the United States before its officials devote attention to

formulating and implementing a remedy"); *United States Postal Serv. v. AFL-CIO*,

481 U.S. 1301, 1302-03 (1987) (Rehnquist, C.J., in chambers) (finding that

equities favor stay where employer will face injury because "temporary

reinstatement of [a discharged employee], a convicted criminal, will seriously

impair the applicant's ability to impress the seriousness of the Postal Service's

mission upon its workers"). Here, both the "substantial question" and "good

cause" standards are easily met.

### A. Hungary's Petition Will Present Substantial Legal Questions

Hungary anticipates presenting one or more of the following substantial

legal questions in its petition for a writ of certiorari:

> **1. Whether, in Conflict with Supreme Court Precedent and the Decisions of Numerous Circuits, this Court Improperly "Clarified" Plaintiffs' Claim at the Rule 12(b)(6) Stage by Considering Facts that Were Neither Mentioned in the Complaint Nor in Documents Properly Subject to this Court's Review**

It is well-established that a court is limited in the scope of documents it can

consider when reviewing a motion to dismiss under Rule 12(b)(6). In determining

whether a complaint states a claim, a court may consider the facts alleged in the

complaint, documents attached thereto or incorporated therein, and matters of

which it may take judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*.,

551 U.S. 308, 322 (2007) (citing 5B Wright & Miller § 1357 (3d ed. 2004 and

Supp. 2007)); *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003); *In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1424-25 (3d Cir. 1997).

To the extent that Plaintiffs' complaint can be interpreted to raise a cognizable bailment claim, the source of that agreement is the 1947 Peace Treaty, as Plaintiffs themselves maintain that the treaty created Hungary's custodial role and obligation to return the works.  In finding that the complaint raises a viable bailment claim, the panel ignored the complaint's affirmative references to the treaty as the source of Hungary's custodial role, and reasoned that Plaintiffs "subsequently 'clarified that they do not rely or challenge the terms, conditions, or validity of the Peace Treaty, or seek to claim directly under the Peace Treaty,'" Slip Op. 13-14 (quoting *de Csepel*, 808 F. Supp. 2d at 136 n.6) by distancing themselves from these allegations in a surreply.

In so finding, the panel contravened well-established, uniform precedent by considering materials not properly before it and by impermissibly amending Plaintiffs' complaint in an effort to clarify their bailment claim.  *See Peterson v. Atlanta Hous. Auth.*, 998 F.2d 904, 912 (11th Cir. 1993) (admonishing that the "court's duty to liberally construe a plaintiff's complaint in the face of a motion to dismiss is not the equivalent of a duty to re-write it for her"); *Bender v. Suburban Hosp., Inc.*, 159 F.3d 186, 192 (4th Cir. 1998) ("[N]otice pleading requires generosity in interpreting a plaintiff's complaint.  But generosity is not fantasy.").

Absent this Court's "clarification" of Plaintiffs' bailment claim – which, as this Court recognized, is the sole, stand-alone claim in this action – and this Court's willingness to bow to Plaintiffs' post-complaint efforts to distance themselves from the 1947 Peace Treaty, which governs Plaintiffs' taken property claims, Plaintiffs' complaint fails as the 1947 Peace Treaty and the 1973 Agreement (both of which predate the FSIA) govern the claim, and thus no exception to the FSIA would be applicable. Moreover, this Court's decision creates an internal and external circuit split because (1) courts within the District of Columbia Circuit are now left without clear direction as to the proper scope of and review of a motion to dismiss and are instead impermissibly emboldened to "clarify" a plaintiff's complaint without requiring amendment of the complaint, and (2) this decision conflicts with other circuits that recognize and follow the limitations imposed on a court at the Rule 12(b)(6) stage.

> **2.     Whether, in Conflict with Supreme Court Precedent and the Decisions of Numerous Circuits, this Court Improperly Rejected as "Premature" the District Court's Recognition that the Face of Plaintiffs' Complaint Established an Affirmative Defense Warranting Dismissal**

This Court agreed with the district court's application of international comity principals to the facts in this case. This Court agreed with the district court's application of Supreme Court precedent and rejected Plaintiffs' primary challenge to the district court's comity finding, noting that Plaintiffs' speculative

policy challenge "is precisely the type of 'mere assertion' by a party that a foreign judgment 'was erroneous in law or in fact' that the Supreme Court has held may not be grounds for declining to respect the results of foreign judgments."  Slip Op. at 27 (quoting *de Csepel*, 808 F. Supp. 2d at 145 (quoting *Hilton v. Guyot*, 159 U.S. 113, 203 (1895) and citing *Medellin v. Dretke*, 544 U.S. 660, 670 (2005))).

Nonetheless, this Court found the district court's properly-reasoned comity finding to be premature, on the ground that Plaintiffs are not required to negate an affirmative defense in the complaint.  Slip Op at 28-29.  The panel's holding violates well-established precedent that an affirmative defense may be raised in a motion to dismiss where, as here, "the facts that give rise to the defense are clear from the face of the complaint."  *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998).

The Supreme Court recognizes that "[w]hether a particular ground for opposing a claim may be the basis for dismissal for failure to state a claim depends on whether the allegations in the complaint suffice to establish that ground, not on the nature of the ground in the abstract."  *Jones v. Bock*, 549 U.S. 199, 215 (2007). This reasoning has been echoed by courts around the country.  *See*, *e.g.*, *Smith-Haynie*, 155 F.3d at 578; *Marsh v. Genentech, Inc*., 693 F.3d 546, 555 (6th Cir. 2012); *C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d 758, 763 (8th Cir. 2012); *Douglas v. Yates*, 535 F.3d 1316, 1321 (11th Cir. 2008); *Lopez-Gonzalez v.*

*Municipality of Comerio*, 404 F.3d 548, 551 (1st Cir. 2005); *Leveto v. Lapina*, 258

F.3d 156, 161 (3d Cir. 2001); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67,

74 (2d Cir. 1998). "As the case law makes clear, the complaint . . . is subject to

dismissal under Rule 12(b)(6) when its allegations indicate the existence of an

affirmative defense that will bar the award of any remedy" provided that "the

applicability of the defense [is] clearly indicated and [appears] on the face of the

pleading to be used as the basis for the motion." 5B Charles Alan Wright, Arthur

Miller, Mary Kay Kane & Richard Marcus, Federal Practice & Procedure § 1357 at

713 (3d ed. 2004).

Plaintiffs' complaint concedes that family member Martha Nierenberg

litigated claims to the artworks in Hungary by filing a complaint in Hungary and,

after many years of litigation, receiving a decision from the appellate court in

January 2008. As Plaintiffs made this concession and rely repeatedly on the 2008

decision as the basis for the supposed "repudiation" of the bailment, it is obvious

that the "facts supporting defendants' dispositive motion [comity challenge] were

apparent to [Plaintiffs] from the inception of [their] lawsuit." *Smith-Haynie*, 155

F.3d at 578. Thus, the district court did not err in adjudicating the comity

challenge. Hungary's international comity challenge was properly before this

Court at the Rule 12(b)(6) stage, and this Court ignored circuit precedent, non-

-9-

circuit precedent, and the Supreme Court by rejecting Hungary's comity challenge

as premature.

> **3.** **Whether this Court's Unreasonable Inference of Specific Performance in the United States Can Constitute a Direct Effect Sufficient To Invoke and Expand Impermissibly the FSIA's Commercial Activity Exception**

>> ***a.*** ***Plaintiffs' Complaint Fails to Allege a Plausible "Direct Effect" in the United States Sufficient to Strip Hungary of its Presumptive Immunity***

The third test of the FSIA's commercial activity exception – the only test

that can apply to the facts of this case – provides

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). The complaint does not allege expressly a direct effect in

the United States. This Court found that the test was satisfied, however, by

inferring that Plaintiffs' yet-undefined bailment claim contemplated return of one

third of the property (presumably the one-third portion attributed to the sole U.S.

citizen plaintiff) in the United States. In reaching this conclusion, this Court

ignored materials properly before it that not only made the inference of

performance in the United States unreasonable, but made such an inference utterly

implausible and, therefore, not a lawful basis on which to strip Hungary of its

presumptive immunity.

It is not disputed that at the motion to dismiss phase, this Court must draw from the allegations in the complaint all reasonable inferences in Plaintiffs' favor. *See*, *e.g.*, *Blackburn v. Fisk University*, 443 F.2d 121, 123 (6th Cir. 1971); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031-32 (9th Cir. 2008).   This Court inferred that the alleged bailment contract envisioned a direct effect in the United States because the contemplated return of property "was to be directed to members of the Herzog family Hungary knew to be residing in the United States."  Slip Op. at 16.

This inference is directly contradicted by the complaint and by documents before this Court, which affirmatively demonstrate that it is unreasonable to assume that the parties to the alleged bailment would anticipate that artworks owned by non-U.S. citizens (with no connection to the United States) would be returned to the United States.  Moreover, the district court took judicial notice of (1) Hungarian laws that *prevent* the export of artwork of historical and cultural significance, like the artwork in question, unless permission is first sought and granted, and (2) the 2008 Nierenberg Decision, which referred explicitly to these export limitation laws governing artworks of historical and cultural significance and explained that these laws posed an insurmountable barrier to Nierenberg's replevin claim.

Because Plaintiffs' complaint fails to allege that the purported bailment contemplated specific performance in the United States, and because the materials before this Court (including the complaint) demonstrate that Hungary would not (or could not) return artworks to the U.S. citizen plaintiff in the United States, this Court's inference of direct effect is unsupportable.

> ### b.    Finding a "Direct Effect" in the United States where the Materials Properly before this Court Demonstrate that Performance in the United States Is Unreasonable (if Not Impossible) Expands the Well-Settled and Narrow Reading of the Commercial Activity Exception

Case law provides that where a contract or agreement was made in a foreign country and there is little or no connection to the United States, but the agreement contemplates *performance* in the United States, such performance can constitute a "direct effect" sufficient to satisfy the commercial activities exception's third test. *See*, *e.g.*, *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618-19 (1992); *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 241 (2d Cir. 1994). Where, however, there is no evidence that performance of the agreement was intended to occur in the United States, no "direct effect" can be found.  *See*, *e.g.*, *Filetech S.A. v. France Telecom, S.A*., 212 F. Supp. 2d 183, 197 (S.D.N.Y. 2001), *aff'd and opinion adopted and incorporated as the law of the Circuit by*, 304 F.3d 180, 182 (2d Cir. 2002) ("In [*Weltover*] and its progeny, the ultimate object of the contract – the contract's *raison d'etre*  – was the payment of funds in the United

States.  In the case at bar, there is no evidence that [the defendant's] activities in France intended or contemplated a specific effect in the United States." (citation omitted)); *Westfield v. Federal Republic of Germany*, 633 F.3d 409, 416 (6th Cir. 2011) (finding no direct effect because Germany was under no obligation to send the collection to the United States).

Plaintiffs' complaint does little more than allege an amorphous bailment, under which (presumably) Hungary has an obligation to relinquish artworks.  As noted above, the complaint does not assert performance in the United States and there is no support for this Court's unreasonable inference that performance in the United States can be inferred.  This basic allegation of unlawful possession is, therefore, analogous to situations where foreign sovereigns are obligated by contract to turn over funds, but there is no affirmative obligation in the agreement that those funds must be paid to accounts in the United States.  Courts recognize that in such circumstances, a sovereign's failure to pay does not cause a direct effect in the United States.  *See Westfield*, 633 F.3d at 416 ("Although the entity might ultimately feel the financial injury at home in the United States, we have held that those reverberations are too attenuated to qualify as direct effects."); *see also Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 78 (2d Cir. 2010) (noting that "the mere fact that a foreign state's commercial activity outside of the United States caused physical or financial injury to a United States citizen is not itself

-13-

sufficient to constitute a direct effect in the United States"); *Big Sky Network Can., Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183, 1191 (10th Cir. 2008) (holding that "failure to receive promised funds abroad will not qualify as a 'direct effect in the United States'"); *Antares Aircraft, L.P. v. Fed. Republic of Nigeria*, 999 F.2d 33, 36-37 (2d Cir. 1993) ("If a loss to an American individual and firm resulting from a foreign tort were sufficient standing alone to satisfy the direct effect requirement, the commercial activity exception would in large part eviscerate the [Act's] provision of immunity for foreign states."); *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1515 (D.C. Cir. 1988).[1]  Because this Court's expansive reading of the FSIA's commercial activity exception advocates finding a direct effect even when there is no express or implicit requirement in the purported agreement that would require performance in the United States, this Court's reasoning contradicts the reasoned decisions of numerous circuits and requires review by the Supreme Court.

---

[1]  The fact that one of the three Plaintiffs is a U.S. citizen – again, the only connection this case has to the United States – does not counsel in favor of finding a direct effect.  *See Rogers v. Petroleo Brasileiro, S.A*., 673 F.3d 131, 140 (2d Cir. 2012) ("We note that the plaintiffs' status as United States citizens does not sufficiently outweigh the fact that payment was not contemplated in the United States so as to afford the District Court jurisdiction."); *Keller v. Cent. Bank of Nigeria*, 277 F.3d 811, 817-18 (6th Cir. 2002); *Virtual Countries, Inc. v. Republic of S. Africa*, 300 F.3d 230, 240 (2d Cir. 2002) (holding that the theory that "any U.S. corporation's financial loss constitutes a direct effect in the United States [to be] plainly flawed" and observing that its reasoning was equally applicable to a natural person); *Antares Aircraft, L.P.*, 999 F.2d at 36.

As the Supreme Court is likely to grant certiorari on one or more of these significant legal questions, this Court should grant Hungary's motion to stay the mandate.

**B.      The Equities Favor a Stay and Hungary Will Suffer Irreparable Injury if the Stay is Denied**

Good cause for a stay of the mandate exists because Hungary faces a significant possibility of severe and irreparable harm if the mandate issues now, while Plaintiffs can make no such showing that a ninety day delay will pose a hardship.  Allowing the mandate to issue when questions concerning (1) the fundamental integrity of proceedings in the district court and this Court, and (2) this Court's expansive reading of the FSIA have not been fully resolved, subjects Hungary, a foreign sovereign, to the threat of severe and unnecessary injury, namely being stripped of its presumptive immunity and subjected to the jurisdiction of foreign courts.   It also subjects both the federal judiciary and the parties to costly and distracting proceedings that may prove in the end to be of no avail.  As proceedings on remand in this action will "require significant time and attention," the interests of the parties, the judiciary and the public would best be served by affording Hungary "a full opportunity to seek review in the Supreme Court of the United States" before going forward.  *Books*, 239 F.3d at 829.

### C.    The Supreme Court has a Demonstrated Interest in Resolving Challenges to the FSIA

Since 1981, the Supreme Court has reviewed more than 100 petitions where the FSIA was central to the questions presented.  The Supreme Court granted more than fifteen of these petitions, granting at least four such petitions in the last eight years.  *See Samantar v. Yousuf*, 560 U.S. 305 (2010); *Republic of Iraq v. Beaty*, 129 S. Ct. 2183 (2009); *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193 (2007); *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224 (2007).  Because the proper and uniform application of the FSIA is of such great importance, the Supreme Court routinely solicits the views of the Solicitor General who, together with the State Department, has filed amicus briefs in connection with a significant number of petitions involving the FSIA.[2]

---

[2]  *See*, *e.g.*, Brief for the United States as *Amicus Curiae* in *EM Ltd., v. Republic of Argentina* (11-604) at http://www.justice.gov/osg/briefs/2011/2pet/6invit/2011-0604.pet.ami.inv.pdf; Brief for the United States as *Amicus Curiae* in *Kingdom of Spain v. Estate of Claude Cassirer* (10-786) at http://www.justice.gov/osg/briefs/2010/2pet/6invit/2010-0786.pet.ami.inv.pdf; Brief for the United States as *Amicus Curiae* in *City of New York v. Permanent Mission of India to the United Nations* (10-627) at http://www.justice.gov/osg/briefs/2010/2pet/6invit/2010-0627.pet.ami.inv.pdf; Brief for United States as *Amicus Curiae* in *Holy See v. Doe* (09-1) at http://www.justice.gov/osg/briefs/2009/2pet/6invit/2009-0001.pet.ami.inv.pdf; Brief for United States as *Amicus Curiae* Supporting Affirmance in *Samantar v. Yousuf* (08-1555) (emphasizing that Congress must "speak clearly when it intends to change common law principles") at http://www.justice.gov/osg/briefs/2009/3mer/1ami/2008-1555.mer.ami.pdf; Brief for the United States as *Amicus Curiae* in *Federal Ins. Co. v. Kingdom of Saudi Arabia* (08-640) at http://www.justice.gov/osg/briefs/2008/2pet/6invit/2008-

Because the Supreme Court has a demonstrated interest in cases challenging the interpretation and application of the FSIA and the parameters of sovereign immunity, this Court should grant Hungary's motion to stay the mandate.

---

0640.pet.ami.inv.pdf; Brief of United States as *Amicus Curiae* in *Beaty v. Republic of Iraq* (07-1090, 08-539) at http://www.justice.gov/osg/briefs/2008/2pet/6invit/2007-1090.pet.ami.inv.pdf; Brief of United States as *Amicus Curiae* in *Permanent Mission of India to the United Nations v. City of New York* (06-134) (recommending reversal because the lower court's interpretation of the FSIA could "encourage foreign states to assert jurisdiction . . . or to take retaliatory actions against property of the United States abroad") at http://www.justice.gov/osg/briefs/2006/3mer/1ami/2006-0134.mer.ami.pdf; Brief of United States as *Amicus Curiae* Supporting Petitioner in *Powerex Corp. v. Reliant Energy Servs., Inc.* (05-85) at http://www.justice.gov/osg/briefs/2006/3mer/1ami/2005-0085.mer.ami.pdf; Brief for United States as *Amicus Curiae* in *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi* (04-1095) at http://www.justice.gov/osg/briefs/2005/2pet/6invit/2004-1095.pet.ami.inv.pdf; Brief of United States as *Amicus Curiae* Supporting Petitioners in *Republic of Austria v. Altmann* (03-13) (recognizing that the United States "has a unique perspective on the government's sovereign immunity practice before enactment of the FSIA") at http://www.justice.gov/osg/briefs/2003/3mer/1ami/2003-0013.mer.ami.pdf; Brief of United States as *Amicus Curiae* in *Dole Food Co. v. Patrickson, et al.* (01-593, 01-594) at http://www.justice.gov/osg/briefs/2001/2pet/6invit/2001-0593.pet.ami.inv.pdf (noting that the United States "has a substantial interest in the proper construction of the [FSIA] which presents the sole basis for civil litigants to obtain jurisdiction over a foreign state in United States courts" and that the United States "has a significant stake in its correct application and has consistently participated in cases before this Court construing its terms"); Brief for the United States as *Amicus Curiae* in *Saudi Arabia v. Nelson* (91-522) at 1992 WL 12012040; Brief for the United States as *Amicus Curiae* Supporting Respondents in *Republic of Argentina v. Weltover, Inc.* (91-763) at 1992 WL 12012096; Brief for the United States as *Amicus Curiae* in *Verlinden, B.V. v. Central Bank of Nigeria* (81-920) at 1981 WL 663901.

-17-

**D.**   **The Potential International Implications of this Court's Decision Warrant Review by the Supreme Court**

Review by the Supreme Court is further warranted because this Court's decision may have important and significant implications for foreign relations. *See Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 115 (1987) (noting that great caution should be exercised in the assertion of jurisdiction over foreign defendants in view of "the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction" as well as "the Federal Government's interest in its foreign relations policies"). Foreign sovereigns will be rightly troubled by a decision empowering federal courts to strip a sovereign entity of its immunity where the alleged wrong occurred outside the United States and two of the three plaintiffs are non-U.S. citizens with no identified connection to the United States. This is clearly an issue of preeminent concern to the Supreme Court, as it recently admonished that federal courts should not rush to take jurisdiction over lawsuits brought by non-U.S. citizens involving claims that arose outside the United States. *See Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013).[3]

---

[3] This country certainly would not allow itself to be put in the position that it so freely forces on Hungary. Indeed, to avoid this, the United States withdrew, with limited exceptions, from the International Court of Justice in 1986, and has not joined the International Criminal Court of Justice, founded in 2002. *See* Sean D. Murphy, Principles of International Law 135 (2006); Jennifer Elsea, Congressional Research Service, Report for Congress, U.S. Policy Regarding the International Criminal Court 2 (Aug. 29, 2006).

## CONCLUSION

For the foregoing reasons, Hungary respectfully requests that this Court stay issuance of its mandate pending Hungary's petition for a writ of certiorari.

Dated: June 10, 2013                    Respectfully submitted,

                                        /s/ Sarah E. André
                                        Thaddeus J. Stauber
                                        Sarah E. André (Bar. No. 53682)
                                        NIXON PEABODY LLP
                                        Gas Company Tower
                                        555 West Fifth Street
                                        Los Angeles, CA 90013
                                        tstauber@nixonpeabody.com
                                        sandre@nixonpeabody.com

                                        D. Grayson Yeargin
                                        Emily C. Harlan
                                        NIXON PEABODY LLP
                                        401 Ninth Street, N.W., Suite 900
                                        Washington, D.C. 20004-2128
                                        Telephone: (202) 585-8000
                                        Facsimile: (202) 585-8080
                                        gyeargin@nixonpeabody.com
                                        eharlan@nixonpeabody.com

                                        *Counsel for Defendants*
                                        *Republic of Hungary, The Hungarian*
                                        *National Gallery, The Museum of Fine*
                                        *Arts, The Museum of Applied Arts, and*
                                        *the Budapest University of Technology*
                                        *and Economics*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 10th day of June, 2013, I caused this Motion to

Stay the Court's Mandate Pending Disposition of Petition for Writ of Certiorari to

be filed electronically with the Clerk of the Court using the CM/ECF System,

which will send notice of such filing to the following registered CM/ECF users:

Michael Dewayne Hays
Alyssa T. Saunders
DOW LOHNES PLLC
1200 New Hampshire Avenue, N.W., Suite 800
Washington, D.C., 20036

*Counsel for Appellees*

Sheron Korpus
Alycia Regan Benenati
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019

*Counsel for Appellees*

Michael Shuster
Dorit U. Black
HOLWELL SHUSTER & GOLDBERG LLP
335 Madison Avenue, 9th Floor
New York, NY 10017

*Counsel for Appellees*

Agnes Peresztegi
PERESZTEGI LAW OFFICE
So u 2
Budapest, Hungary  1056

*Counsel for Appellees*

I further certify that on this 10th day of June, 2013, I caused the required

number of bound copies of the Motion to Stay the Court's Mandate Pending

Disposition of Petition for Writ of Certiorari to be hand-filed.

/s/ Sarah E. André
*Counsel for Defendants-Appellants/*
  *Cross-Appellees*

# ADDENDUM

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 23, 2013         Decided April 19, 2013

No. 11-7096

DAVID L. DE CSEPEL, ET AL.,
APPELLEES/CROSS-APPELLANTS

v.

REPUBLIC OF HUNGARY, A FOREIGN STATE, ET AL.,
APPELLANTS/CROSS-APPELLEES

———

Consolidated with 12-7025, 12-7026

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:10-cv-01261)

———

*Thaddeus J. Stauber* argued the cause for appellants/cross-appellees. With him on the briefs were *D. Grayson Yeargin* and *Sarah E. André*. *David D. West* entered an appearance.

*Michael S. Shuster* argued the cause for appellees/cross-appellants. With him on the briefs were *Dorit Ungar Black*, *Sheron Korpus*, *Alycia Regan Benenati*, *Michael D. Hays*, and *Daniel D. Prichard*. *Agnes Peresztegi* and *Alyssa T. Saunders* entered appearances.

2

Before: TATEL, *Circuit Judge*, WILLIAMS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: As part of the wholesale plunder of Jewish property carried out during the Holocaust, the Hungarian government, acting in collaboration with Nazi Germany, confiscated the "Herzog Collection"—one of Europe's largest and finest private art collections. Plaintiffs, descendants of the Collection's owner, claim that following World War II the Hungarian government entered into bailment agreements with them to retain possession of the Collection and later breached those agreements by refusing to return the artwork. Finding Hungary's bevy of arguments in support of dismissal unpersuasive, we affirm the district court's partial denial of its motion to dismiss. But because we agree with plaintiffs that the district court prematurely dismissed several of their claims on international comity grounds, we reverse that portion of the decision.

## I.

Baron Mór Lipót Herzog was a "passionate Jewish art collector in pre-war Hungary" who assembled a collection of more than two thousand paintings, sculptures, and other artworks. Compl. ¶ 38; *see Atherton v. District of Columbia Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (in reviewing district court's ruling on motion to dismiss, we accept the complaint's allegations as true). Known as the "Herzog Collection," this body of artwork was "one of Europe's great private collections of art, and the largest in Hungary," and included works by renowned artists such as El Greco, Diego Velázquez, Pierre-Auguste Renoir, and Claude Monet. Compl. ¶ 38. Following Herzog's death in 1934 and

3

his wife's shortly thereafter, their daughter Erzsébet and two sons István and András inherited the Collection. *Id.* ¶ 39.

Then came World War II, and Hungary joined the Axis Powers. In March 1944, Adolf Hitler sent German troops into Hungary, and SS Commander Adolf Eichmann entered the country along with the occupying forces and established headquarters at the Majestic Hotel in Budapest. *Id.* ¶¶ 51, 60. During this time, Hungarian Jews were subjected to anti-Semitic laws restricting their economic and cultural participation in Hungarian society and deported to German concentration camps. *Id.* ¶¶ 44, 47, 52. As an integral part of its oppression of Hungarian Jews, "[t]he Hungarian government, including the Hungarian state police, authorized, fully supported and carried out a program of wholesale plunder of Jewish property, stripping anyone 'of Jewish origin' of their assets." *Id.* ¶ 54. Jews "were required to register all of their property and valuables" in excess of a certain value, and the Hungarian government "inventoried the contents of safes and confiscated cash, jewelry, and other valuables belonging to Jews." *Id.* ¶ 55. "[P]articularly concerned with the retention of artistic treasures belonging to Jews," the Hungarian government established "a so-called Commission for the Recording and Safeguarding of Impounded Art Objects of Jews . . . and required Hungarian Jews promptly to register all art objects in their possession." *Id.* ¶ 56. "These art treasures were sequestered and collected centrally by the Commission for Art Objects," headed by the director of the Hungarian Museum of Fine Arts. *Id.*

In response to widespread looting of Jewish property, the Herzogs "attempted to save their art works from damage and confiscation by hiding the bulk of [them] in the cellar of one of the family's factories at Budafok." *Id.* ¶ 58. Despite these efforts, "the Hungarian government and their Nazi[]

4

collaborators discovered the hiding place" and confiscated the artworks. *Id.* ¶ 59. They were "taken directly to Adolf Eichmann's headquarters at the Majestic Hotel in Budapest for his inspection," where he "selected many of the best pieces of the Herzog Collection" for display near Gestapo headquarters and for eventual transport to Germany. *Id.* ¶ 60. "The remainder was handed over by the Hungarian government to the Museum of Fine Arts for safekeeping." *Id.* After seizure of the Collection, a pro-Nazi newspaper ran an article in which the director of the Hungarian Museum of Fine Arts boasted that "[t]he Mór Herzog collection contains treasures the artistic value of which exceeds that of any similar collection in the country. . . . If the state now takes over these treasures, the Museum of Fine Arts will become a collection ranking just behind Madrid." *Id.* ¶ 59.

"Fearing for their lives, and stripped of their property and livelihoods, the Herzog family was forced to flee Hungary or face extermination." *Id.* ¶ 63. Erzsébet Herzog (Erzsébet Weiss de Csepel following her marriage) fled Hungary with her children, first reaching Portugal and eventually settling in the United States, where she became a U.S. citizen in 1952. *Id.* István Herzog was nearly sent to Auschwitz but "escaped after his former sister-in-law's husband . . . arranged for him to be put in a safe house under the protection of the Spanish Embassy." *Id.* ¶ 42. Several members of his family escaped to Switzerland while others remained in Hungary. *Id.* ¶ 64. István Herzog died in 1966, leaving his estate to his two sons, Stephan and Péter Herzog, and his second wife, Mária Bertalanffy. *Id.* ¶ 42. András Herzog was "sent . . . into forced labor in 1942 and he died on the Eastern Front in 1943." *Id.* ¶ 41. His daughters, Julia Alice Herzog and Angela Maria Herzog, fled to Argentina and eventually settled in Italy. *Id.* ¶ 64.

Following the end of World War II, the Herzog family began a seven-decade struggle to reclaim the Collection. The complaint alleges that, "[u]pon information and belief," some pieces of the Herzog Collection remained in Hungary after the war, while others were shipped to Germany or elsewhere. *Id.* ¶¶ 60–62. As to the artwork remaining in Hungary, "at least forty works of art . . . are known to be in the . . . possession of the Museum of Fine Arts (Szépmüvészeti Múzeum), Budapest, the Hungarian National Gallery, and the Museum of Applied Arts, Budapest . . ., as well as the Budapest University of Technology and Economics." *Id.* ¶ 2. According to the complaint, several of these pieces "were being openly exhibited" on the walls of these museums with "tags under the paintings identif[ying] them as 'From the Herzog Collection.' " *Id.* ¶ 77.

During the Communist era, which began in the late 1940s, "little information could be obtained about the state of the Herzog Collection." *Id.* ¶ 75. After the fall of Communism in 1989, Erzsébet Weiss de Csepel, then 89 years old, began negotiations with the Hungarian government for return of the Herzog Collection. *Id.* ¶ 78. Weiss de Csepel, however, was only able to obtain seven pieces of lesser value, and "[t]he identifiable masterworks remained in the Museum of Fine Arts and the Hungarian National Gallery." *Id.* Following Weiss de Csepel's death in 1992, her daughter, Martha Nierenberg, continued negotiating with the Hungarian government for return of the artwork. *Id.* ¶ 79.

In 1999, Martha Nierenberg, seeking return of twelve pieces of the Herzog Collection, filed suit in Hungary. *See de Csepel v. Republic of Hungary*, 808 F. Supp. 2d 113, 125 (D.D.C. 2011) (discussing the Hungarian litigation). Shortly after that litigation began, the Museum of Fine Arts returned one painting to her without explanation. *Id.* Other members of

6

the Herzog family—András's daughters Angela and Julia Herzog, as well as István's sons—later intervened as defendants due to a dispute, now resolved, about which members of the Herzog family owned certain pieces of the Collection. *Id.* The Budapest Metropolitan Court initially found in Martha Nierenberg's favor, ordering that all but one of the paintings be returned to her. *Id.* at 126. After several appeals and many more years of litigation, however, the Metropolitan Appellate Court ultimately dismissed the action in 2008. As the district court here explained, the Metropolitan Appellate Court held that "Ms. Nierenberg's claim had been extinguished by [an executive agreement settling certain claims by U.S. nationals against Hungary], and that additional defendants had acquired title through adverse possession." *Id.* at 145.

On July 27, 2010, several members of the Herzog family filed this suit in the United States District Court for the District of Columbia against the Republic of Hungary, the Hungarian National Gallery, the Museum of Fine Arts, the Museum of Applied Arts, and the Budapest University of Technology and Economics (collectively "Hungary"), asserting claims for bailment, conversion, constructive trust, accounting, declaratory relief, and restitution based on unjust enrichment. Plaintiffs are David L. de Csepel, a United States citizen who is the grandson of the late Erzsébet Weiss de Csepel, and Angela Maria and Julia Alice Herzog, Italian citizens who are the daughters of the late András Herzog (collectively "the Herzog family"). *Id.* ¶¶ 6–8. Having "authority to represent all of the Herzog Heirs in this action," *id.*, plaintiffs seek the return of "at least forty works of art" from the original Herzog Collection still allegedly in Hungary's possession, *id.* ¶ 2. Their primary claim is one for bailment. Specifically, they allege that "[i]n the years immediately following [World War II], the Museums and the

7

University, acting at Hungary's direction, became custodians of artworks" that had been looted during the war and "arranged with representatives of the Herzog Heirs to retain possession of most of the Herzog Collection . . . so that the works could continue to be displayed in Hungary." *Id.* ¶ 36. According to the family, this arrangement gave rise to a bailment agreement, whereby Hungary assumed "a duty of care to protect the property and to return it to [the Herzog family]" upon their demand. *Id.* ¶ 101. The family claims that Hungary breached these duties in 2008 when it refused their demand to return the Herzog Collection. *Id.* ¶ 104.

Hungary moved to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing that the district court lacked jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 et seq., that the complaint failed to state a claim for bailment, and that the family's claims were barred by the FSIA's "treaty exception," the applicable statute of limitations, the political question doctrine, the act of state doctrine, and the doctrines of forum non conveniens and international comity.

The district court granted the motion in part and denied it in part. Invoking the doctrine of international comity, the court dismissed the family's claims to the eleven pieces of artwork at issue in the Nierenberg litigation. *de Csepel*, 808 F. Supp. 2d at 144–45. In all other respects, the district court denied the motion to dismiss. *Id.* at 145. The court also certified its order for immediate appeal pursuant to 28 U.S.C. § 1292(b).

Hungary now appeals the partial denial of its motion to dismiss, reiterating many of the arguments it made in the district court. The Herzog family cross-appeals the dismissal of their claims to eleven pieces of artwork on international

comity grounds. Unless specified otherwise, our review is de novo. *See Owens v. Republic of Sudan*, 531 F.3d 884, 887 (D.C. Cir. 2008) (denial of foreign sovereign's motion to dismiss for lack of subject matter jurisdiction is reviewed de novo); *Bombardier Corp. v. Nat'l Railroad Passenger Corp.*, 333 F.3d 250, 252 (D.C. Cir. 2003) (denial of motion to dismiss under Rule 12(b)(6) is reviewed de novo). Moreover, and critical to many of the issues before us, in reviewing the district court's denial of Hungary's motion to dismiss for failure to state a claim under Rule 12(b)(6), "we must accept as true all material allegations of the complaint, drawing all reasonable inferences from those allegations in plaintiffs' favor." *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011) (internal quotation marks omitted).

## II.

We begin with Hungary's appeal of the district court's partial denial of its motion to dismiss.

## A.

Hungary first contends that the district court lacked subject matter jurisdiction under the FSIA. Under that statute, "a foreign state shall be immune from the jurisdiction of the courts of the United States" unless one of several enumerated exceptions applies. 28 U.S.C. § 1604. The Herzog family invokes the statute's "expropriation" and "commercial activity" exceptions. *See id.* § 1605(a)(3), 1605(a)(2). Because Hungary "challenges only the legal sufficiency of the [family's] jurisdictional allegations," we "take the [family's] factual allegations as true and determine whether they bring the case within" either of these exceptions. *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).

9

The district court found it had jurisdiction under the expropriation exception, which abrogates sovereign immunity in any case where "rights in property taken in violation of international law are in issue." 28 U.S.C. § 1605(a)(3). Although agreeing with Hungary that "a state's taking of the property of its own citizens, no matter how egregious, does not constitute an international law violation," the district court nonetheless found that this principle posed no bar to application of the expropriation exception because "Hungary did not consider Ms. Nierenberg and Ms. Weiss de Csepel to be Hungarian citizens at the time of the seizures." *de Csepel*, 808 F. Supp. 2d at 129–30. Pointing to the host of "anti-Semitic laws passed by Hungary during World War II," the district court concluded that the country had "*de facto* stripped [Ms. Nierenberg], Ms. Weiss de Csepel, and all Hungarian Jews of their citizenship rights" and that "the alleged Hungarian 'citizenship' of plaintiffs' predecessors" thus did "not preclude the application of the expropriation exception in this case." *Id.* at 130. Moreover, the district court reasoned, even if "the seizure of the Herzog Collection by Hungary alone would not constitute a violation of international law," the Herzog family's allegations regarding "the active involvement of German Nazi officials in the taking of at least a portion of the Herzog Collection" distinguished this case from one where a sovereign acting alone confiscates its own nationals' property. *Id.*

Of course, we have no quarrel with the historical underpinnings of the district court's analysis. During World War II, the Hungarian government did indeed enact a series of anti-Semitic laws "designed to exclude Jews from meaningful roles in Hungarian society." Compl. ¶ 44. This exclusion was both symbolic, through the requirement that Jews "wear distinctive signs identifying themselves as Jewish," *de Csepel*, 808 F. Supp. 2d at 129, and physical, through expulsion "to

10

territories under German control where they were mistreated
and massacred," Compl. ¶ 49. According to the complaint,
moreover, the Hungarian government did not act alone when
it seized the Herzog Collection. Instead, it was "the
Hungarian government and their Nazi[] collaborators" that
"discovered the hiding place" of the Herzog Collection and
confiscated the artwork, acting "as part of a brutal campaign
of genocide" against Hungarian Jews. Compl. ¶¶ 1, 59.

In their complaint, however, the Herzog family seeks to
recover not for the original expropriation of the Collection,
but rather for the subsequent breaches of bailment agreements
they say they entered into with Hungary. Specifically, the
complaint alleges that Hungary's "possession or re-possession
of any portion of the Herzog Collection following [World
War II] constituted an express or implied-in-fact bailment
contract," under which Hungary assumed "a duty of care to
protect the property and to return it to [the Herzog family],"
and which Hungary breached by refusing to return the
Collection in 2008. *Id.* ¶¶ 100–01, 104. The family's claims,
they reiterate, are nothing "more than straightforward
bailment claims that are cognizable in a United States court."
Appellees' Br. 26. Indeed, every one of their other substantive
claims—conversion, constructive trust, accounting, restitution
based on unjust enrichment—appears to stem from the alleged
repudiation of the bailment agreements. Moreover, as we shall
explain below, in responding to Hungary's arguments that
their claims are barred by the FSIA's "treaty exception," the
statute of limitations, the political question doctrine, and the
act of state doctrine, the family repeatedly emphasizes that
their claims are firmly rooted in bailment. Given that
plaintiffs are "masters of the complaint" with the power to
bring those claims they see fit, *see Caterpillar, Inc. v.
Williams*, 482 U.S. 386, 395 (1987), it is incumbent upon us
to address Hungary's jurisdictional challenge in light of the

11

bailment claims the family actually brings. Viewed this way, and without ruling on the availability of the expropriation exception, we believe the family's claims fall comfortably within the FSIA's commercial activity exception. *See Carney v. American University*, 151 F.3d 1090, 1096 (D.C. Cir. 1998) (explaining that "we can affirm a district court judgment on any basis supported by the record").

The Herzog family invokes the provision of the commercial activity exception that abrogates sovereign immunity in any case where "the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). To satisfy this exception, "1) the lawsuit must be based upon an act that took place outside the territory of the United States; 2) the act must have been taken in connection with a commercial activity[;] and 3) the act must have caused a direct effect in the United States." *Rong v. Liaoning Province Government*, 452 F.3d 883, 888–89 (D.C. Cir. 2006). Because Hungary's actions obviously occurred outside the United States, the exception's applicability turns on (1) whether Hungary's repudiation of bailment agreements with respect to the Collection constitutes an act taken in connection with a commercial activity and (2) whether this act caused a "direct effect" in the United States.

Under the first inquiry, we assess "[t]he commercial character of an activity . . . by reference to the nature of the . . . particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). We must examine "not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives" but "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type*

12

of actions by which a private party engages in trade and traffic or commerce." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (internal quotation marks omitted). Hungary's alleged breach of bailment agreements easily satisfies this standard. A bailment is a form of contract, and a foreign state's repudiation of a contract is precisely the type of activity in which a "private player within the market" engages. *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (internal quotation marks omitted); *see also Janini v. Kuwait University*, 43 F.3d 1534, 1537 (D.C. Cir. 1995) ("Private parties often repudiate contracts in everyday commerce and may be held liable therefor."). Moreover, the alleged contract addresses and establishes commercial relations with respect to artwork, for "[t]here is nothing 'sovereign' about the act of lending art pieces . . . . Loans between and among museums (both public and private) occur around the world regularly." *Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298, 314 (D.D.C. 2005) (interpreting the term "commercial activity" in section 1605(a)(3) of the FSIA).

Hungary contends that its alleged repudiation of these bailment agreements constitutes a sovereign act not subject to the commercial activity exception. *See Janini*, 43 F.3d at 1536 (explaining that the commercial activity exception "cannot confer jurisdiction over a foreign state 'where a claim rests entirely upon activities sovereign in character, . . . regardless of any connection the sovereign acts may have with commercial activity' " (alteration in original) (quoting *Nelson*, 507 U.S. at 358 n.4)). As Hungary sees it, the bailment obligations alleged by the family arise from a World War II Peace Treaty with the Allied Powers that requires Hungary to restore or provide compensation for certain property expropriated during the Holocaust. *See* Treaty of Peace with Hungary art. 27, Feb. 10, 1947, 61 Stat. 2065, 41 U.N.T.S. 135 ("the Peace Treaty"). As a result, Hungary contends, any

13

breach of these bailment obligations would amount to sovereign conduct, for "failure to adequately address war reparations as required by a treaty does not constitute a commercial activity." Appellants' Br. 42.

Contrary to Hungary's argument, however, the complaint does not rely on the Peace Treaty as the sole source of the bailment obligations. Instead, the complaint contains allegations that the parties directly agreed to a bailment relationship, with Hungary "arrang[ing] with representatives of the Herzog Heirs to retain possession of most of the Herzog Collection" and the Herzog family "agree[ing] to allow the artworks to be 'returned' to the Museums or the University for safekeeping." Compl. ¶¶ 36, 72. Although the complaint refers to the Peace Treaty, it nowhere alleges that the Treaty is the source of the bailment obligations. Instead, it clarifies that Hungary obtained only a custodial interest in looted property, rather than ultimate ownership rights. *See id.* ¶ 31 ("Pursuant to the 1947 Treaty of Peace between Hungary and the Allies . . . , Hungary received only a custodial interest in art that had been looted during the war and subsequently returned to Hungary by the Allies, including the Herzog Collection."); *id.* ¶ 69 ("The 1947 Peace Treaty . . . confirmed that Hungary was to act solely as a custodian or trustee of looted or heirless property [and] under no circumstances could Hungary itself possess any right, title or interest in that property."). Accordingly, as the district court explained, although "plaintiffs' bailment claim is *consistent* with Hungary's representations in the 1947 Peace Treaty, plaintiffs do not assert that the bailment was created by virtue of the Peace Treaty." *de Csepel*, 808 F. Supp. 2d at 136 (citation omitted). It is true, as Hungary emphasizes, that certain statements in the family's district court briefs seem to suggest that the bailment arose from the Peace Treaty. But as the district court noted, the family subsequently "clarified that

14

they do not rely upon or challenge the terms, conditions, or validity of the Peace Treaty, or seek to claim directly under the Peace Treaty," *id.* at 136 n.6 (internal quotation marks omitted), and nothing in the complaint contradicts this assertion. Accordingly, the Peace Treaty provides no basis for converting the commercial act of contract repudiation into the sovereign act of "treaty participation," as Hungary urges. Appellants' Br. 42.

Nor does the fact that the Herzog Collection was initially expropriated by the Hungarian government compel a contrary conclusion. To be sure, expropriation "constitute[s] a quintessentially sovereign act" falling outside the scope of the commercial activity exception. *Rong*, 452 F.3d at 890. Here, however, the particular conduct upon which the family's suit is "based" for purposes of the commercial activity exception is not the initial expropriation of the Collection during the Holocaust but instead Hungary's creation and repudiation of subsequently formed bailment agreements. *See* Appellees' Br. 49 ("Here, the relevant 'act' or 'acts' for purposes of Section 1605(a)(2) . . . is the creation of a bailment with respect to each of the artworks described in the Complaint."). Taking issue with the family's characterization of their claims, Hungary insists that "[a]lthough Plaintiffs attempt to dress their claim as a bailment, it is simply a claim that Hungary took property from Hungarian citizens near the end of World War II and . . . refused to restitute specific items." Appellants' Reply Br. 35. This is inaccurate. The complaint actually alleges that, by entering into bailment agreements to retain possession of the expropriated artwork and later breaching those agreements by refusing to return the artwork, Hungary took affirmative acts beyond the initial expropriation to deprive the family of their property rights in the Collection. These allegations distinguish this case from one "in essence based on disputed takings of property" and thus outside the

15

purview of the commercial activity exception. *Garb v. Republic of Poland*, 440 F.3d 579, 588 (2d Cir. 2006); *see Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 944–45 (D.C. Cir. 2008) (endorsing theory of a separate deprivation of property rights apart from initial expropriation where court decree required return of the property and foreign state allegedly frustrated enforcement of the decree).

Turning to the second inquiry—whether the act in question caused a "direct effect" in the United States—we ask whether the complaint alleges that Hungary promised to perform specific obligations in the United States. *See Weltover*, 504 U.S. at 619 ("Because New York was . . . the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming."); *cf. Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 90 (D.C. Cir. 2005) (finding the requisite "direct effect" lacking where plaintiff failed to allege "that Saudi Arabia was supposed to refund his GOSI contribution to him in the United States" (internal quotation marks omitted)). Applying this standard, the Sixth Circuit found that Nazi Germany's seizure of a German resident's artwork caused no "direct effect" in the United States where plaintiffs had "not alleged that Germany ever promised to deliver [the] art collection to the United States." *Westfield v. Federal Republic of Germany*, 633 F.3d 409, 415 (6th Cir. 2011). Here, by contrast, the family alleges that Hungary promised to return the artwork to members of the Herzog family it knew to be residing in the United States and then breached that obligation by refusing to do so. *See* Compl. ¶¶ 36, 101 (alleging that Hungary "knew at all relevant times that the Herzog Heirs owned the Herzog Collection and that

16

certain of the Herzog Heirs resided in the United States";
"owed the Herzog Heirs a duty of care to protect the property
and to return it to them" under the bailment contract; and
breached that obligation by "fail[ing] to restitute the Herzog
Collection following demand by the U.S. Herzog Heirs").
Although the complaint never expressly alleges that the return
of the artwork was to occur in the United States, we think this
is fairly inferred from the complaint's allegations that the
bailment contract required specific performance—i.e., return
of the property itself—and that this return was to be directed
to members of the Herzog family Hungary knew to be
residing in the United States. *See id.* Indeed, Hungary does
not argue that the bailment contract envisioned performance
outside the United States, nor did it seek jurisdictional
discovery in the district court with respect to the contract's
place of performance. Accordingly, drawing all reasonable
inferences from the complaint in the family's favor, as we
must at this stage of the proceedings, *see Council for
Urological Interests v. Sebelius*, 668 F.3d 704, 713 (D.C. Cir.
2011), we find that the family has alleged facts that, if true,
would satisfy the commercial activity exception's requirement
of a "direct effect" in the United States.

## B.

We next turn to Hungary's contention that the FSIA's
"treaty exception" deprived the district court of subject matter
jurisdiction. Because FSIA immunity is "[s]ubject to existing
international agreements to which the United States [was] a
party at the time of enactment of [the FSIA]," 28 U.S.C.
§ 1604, "[i]f there is a conflict between the FSIA and such an
agreement regarding the availability of a judicial remedy
against a contracting state, the agreement prevails," *Moore v.
United Kingdom*, 384 F.3d 1079, 1085 (9th Cir. 2004). "This
existing-treaty exception applies, however, only if there is an
express conflict between the treaty and the FSIA exception."

17

*Wyatt v. Syrian Arab Republic*, 266 F. App'x 1, 2 (D.C. Cir. 2008).

According to Hungary, two international agreements create such an "express conflict": the above-mentioned Peace Treaty between Hungary and the Allied Powers; and the Agreement Between the Government of the United States of America and the Government of the Hungarian People's Republic Regarding the Settlement of Claims, U.S.-Hungary, Mar. 6, 1973, 24 U.S.T. 522 ("the 1973 Agreement").

We begin with the Peace Treaty. Hungary contends that the Treaty conflicts with its amenability to suit under the FSIA because the Treaty precludes litigation against it for claims, like the Herzog family's, that seek restitution of property expropriated during World War II. In support, Hungary cites two provisions of the Treaty. Article 27, as noted above, requires Hungary to restore or provide compensation "in all cases where the property, legal rights or interests in Hungary of persons under Hungarian jurisdiction have, since September 1, 1939, been the subject of measures of sequestration, confiscation or control on account of the racial origin or religion of such persons." Peace Treaty, art. 27. Article 40, in turn, provides that "any dispute concerning the interpretation or execution of the Treaty" that "is not settled by direct diplomatic negotiations" is to be "referred to the Three Heads of [Diplomatic Missions from the Soviet Union, the United Kingdom, and the United States]." *Id.* art. 40. Taken together, Hungary contends, these provisions establish an exclusive treaty-based mechanism for resolving all claims seeking restitution of property discriminatorily expropriated during World War II from individuals subject to Hungarian jurisdiction.

18

Hungary's argument falters for the simple reason that the Herzog family's claims fall outside the Treaty's scope. Article 27 concerns property discriminatorily expropriated during World War II. As we have explained, however, the family's claims rest not on war-time expropriation but rather on breaches of bailment agreements formed and repudiated after the war's end. *See supra* at 10–11. Accordingly, the Peace Treaty presents no conflict with Hungary's amenability to suit under the FSIA.

Hungary makes a similar challenge with respect to the 1973 Agreement, contending that the Agreement bars litigation against it for claims based on expropriation of property during World War II. The 1973 Agreement, on which the Hungarian Metropolitan Appellate Court relied in dismissing the Nierenberg litigation, effectuated a "full and final settlement and . . . discharge" of certain specified claims against Hungary by "nationals and the Government of the United States," including, as relevant here, claims for "property, rights and interests affected by Hungarian measures of nationalization, compulsory liquidation, expropriation, or other taking on or before the date of this Agreement" and claims for "obligations of the Hungarian People's Republic under Articles 26 and 27 of the [Peace Treaty]." 1973 Agreement, arts. 1–2. According to Hungary, "[b]ecause (1) Plaintiffs' predecessor (Erzsébet Weiss de Csepel) was a U.S. national at the time the Agreement went into effect, (2) Plaintiffs' claims related to Hungarian property lost as a result of World War II, and (3) Plaintiffs' claims are subject to Article 27 of the Peace Treaty, the 1973 Agreement . . . bars Plaintiffs' claims." Appellants' Br. 36 (internal quotation marks omitted).

The district court rejected this argument, finding that the 1973 Agreement settled only claims of "persons who were

19

United States citizens at the time of their injury" and thus could not have barred the claims of Erszébet Weiss de Csepel, who was instead a Hungarian citizen at the time of the alleged expropriation. *de Csepel*, 808 F. Supp. 2d at 133–34. Vigorously disputing this interpretation, Hungary argues that the 1973 Agreement applies to all individuals who were U.S. nationals at the time the Agreement was executed, regardless of their nationality when injured.

We need not settle the question of *whom* the Agreement covers because we can easily resolve the issue by examining *what claims* the Agreement covers. To repeat, the Herzog family seeks to recover for breaches of bailment agreements formed and repudiated after World War II, not for the initial expropriation of their property during the war. But because the 1973 Agreement settles claims for property expropriated by Hungary prior to the date of the Agreement, it has no application to bailment agreements allegedly repudiated in 2008. Thus, nothing in the Agreement conflicts with Hungary's amenability to suit under the FSIA.

## C.

Next, Hungary argues that the Herzog family's claims are time-barred. As both parties recognize, the relevant statute of limitations is the District of Columbia's three-year limitations period for claims relating to "the recovery of personal property or damages for its unlawful retention." D.C. Code § 12-301(2); *see Gilson v. Republic of Ireland*, 682 F.2d 1022, 1024 n.7 (D.C. Cir. 1982) ("The applicable statute of limitations [in an FSIA case] is determined by the local law of the forum."). A bailment claim accrues "when the plaintiff demands the return of the property and the defendant refuses, or when the defendant takes some action that a reasonable person would understand to be either an act of conversion or inconsistent with a bailment." *Malewicz v. City of Amsterdam*,

20

517 F. Supp. 2d 322, 335 (D.D.C. 2007) (citing *In re McCagg*, 450 A.2d 414, 416 (D.C. 1982)). In order to trigger the statute of limitations, a defendant's refusal to return the property "must be absolute and unconditional." *Id.* (internal quotation marks omitted). Given this, the family's claims are barred if Hungary "absolute[ly] and unconditional[ly]" refused to return the property prior to July 27, 2007—three years before they filed their complaint.

Hungary argues that the Herzog family's bailment claims accrued in 1999 when Martha Nierenberg filed suit in Hungary. According to Hungary, that litigation was prompted by its "refus[al] to negotiate with Ms. Nierenberg" and thus marked a clear repudiation of the bailment agreements. Appellants' Br. 63 n.18. Though not addressing the question of accrual, the district court equitably tolled the family's claims during the pendency of the Nierenberg litigation in order to account for their efforts to exhaust remedies in the Hungarian courts. *de Csepel*, 808 F. Supp. 2d at 141–42. Hungary challenges this decision, arguing that because equitable tolling is appropriate only where plaintiffs are unaware of the basis for their claims, tolling should not apply here given that the Herzog family demonstrated knowledge of their claims by suing in Hungary. Moreover, Hungary asserts, equitable tolling designed to account for exhaustion of remedies should have no application to the claims of Angela and Julia Herzog "as there can be no assertion that they were prosecuting their rights (and exhausting their remedies) when they were brought into the Hungarian lawsuit." Appellants' Reply Br. 39 n.14.

We have no need to wade into these equitable-tolling waters because nothing in the complaint indicates that the family's claims did in fact accrue in 1999 when Martha Nierenberg filed suit in the Hungarian court. As our case law

21

makes clear, "because statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996). The complaint nowhere alleges that Martha Nierenberg sued because Hungary refused to engage in further negotiations. *Cf.* Compl. ¶ 79 (alleging only that "Martha Nierenberg . . . continued her mother's efforts to recover portions of the Herzog Collection, ultimately pursuing legal proceedings in Hungary"). Indeed, although litigation is often filed in response to refusal of a demand, it can also serve as a vehicle for increasing pressure to settle during ongoing negotiations. *See* David C. Croson & Robert H. Mnookin, *Scaling the Stonewall: Retaining Lawyers to Bolster Credibility*, 1 Harv. Negot. L. Rev. 65, 65 (1996) (explaining that a "plaintiff might hope to extract a settlement by threatening suit in pre-trial negotiations"); Juliet Macur, *Government Joins Suit Against Armstrong*, N.Y. Times, Feb. 22, 2013, at D1 (quoting an attorney who explained that the government may "have brought the case [against Armstrong] to try to increase their leverage in working out a deal").

For statute of limitations purposes, the critical point is that the complaint alleges that Hungary's refusal of the family's demand for the Collection did not occur until January 2008, when "Hungary issued its final decision that it would not honor its obligation to return the Herzog Collection to the Herzog Heirs." Compl. ¶ 94. It was only then, the complaint alleges, that Hungary "made clear that any further demand by the Herzog Heirs for restitution of any portion of the Herzog Collection would be futile." *Id.* At summary judgment, Hungary may well be able to show that the family's bailment claims accrued either when the Nierenberg litigation was filed or at some other point prior to 2008. But at the motion to dismiss stage, we look only at the complaint, in

22

which we see nothing that conflicts with the family's allegation that their bailment claims accrued in January 2008. Because the family filed their complaint within three years of that date, we reject Hungary's statute of limitations argument.

**D.**

We can easily dispose of Hungary's remaining arguments.

Hungary contends that the Herzog family's claims are barred by the political question doctrine. As the district court explained, this argument is "based entirely on the notion that plaintiffs' claims are addressed and settled by the 1947 Peace Treaty and the 1973 Agreement between Hungary and the United States," but the Herzog family instead "charge[s] that Hungary has breached certain agreements regarding specific artwork in a manner that does not implicate existing international compensatory frameworks at all." *de Csepel*, 808 F. Supp. 2d at 143–44. Given this, the family's claims raise no "separation-of-powers concerns that would justify invocation of the political question doctrine." *Id.* at 144.

We are equally unpersuaded by Hungary's reliance on the act of state doctrine. This doctrine, which "requires American courts to presume the validity of an official act of a foreign sovereign performed within its own territory," *Republic of Austria v. Altmann*, 541 U.S. 677, 713 (2004) (internal quotation marks omitted), applies only to "conduct that is by nature distinctly sovereign, *i.e.*, conduct that cannot be undertaken by a private individual or entity," *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1073 (D.C. Cir. 2012). Given that the family seeks to recover for breaches of bailment agreements, the district court got it just right: their claims challenge "not sovereign acts, but rather *commercial* acts" entitled to no "deference under the act of state doctrine."

23

*de Csepel*, 808 F. Supp. 2d at 143 (internal quotation marks omitted).

Hungary next argues that the complaint fails to state a claim for bailment because it nowhere alleges the necessary element of "mutual consent of the parties." Appellants' Br. 59 (internal quotation marks omitted). Reiterating its contention that the family's bailment claims rest solely on the Peace Treaty, Hungary insists that "an international treaty to end a world war" cannot demonstrate intent to form a bailment agreement. Appellants' Reply Br. 37. But as we have explained, *supra* at 13, the complaint contains allegations that the parties directly agreed to a bailment relationship, with Hungary "arrang[ing] with representatives of the Herzog Heirs to retain possession of most of the Herzog Collection" and the Herzog family "agree[ing] to allow the artworks to be 'returned' to the Museums or the University for safekeeping." Compl. ¶¶ 36, 72.

According to Hungary, however, any showing of consent is negated by the complaint's allegations that the Herzog family "had no choice but to agree to allow most of the works belonging to the Herzog Collection to remain in the physical possession of the Museums and the University" because they were "harassed and threatened" by Hungarian government officials. *Id.* ¶¶ 72–73. We disagree. Even if the family's consent was induced by duress—a conclusion we would be reluctant to draw at the motion to dismiss stage—that would mean only that the family could disclaim the agreement, not that the agreement was invalid. *See* Restatement (Second) of Contracts § 175(1) (1981) ("If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim."); *see also U.S. ex rel. Siewick v. Jamieson Science & Engineering, Inc.*, 214 F.3d 1372, 1378

24

(D.C. Cir. 2000) (explaining that voidable contracts only become invalid if injured party exercises right to disclaim). Thus, for purposes of a motion to dismiss, the family has adequately pleaded the element of consent.

Finally, Hungary argues that the doctrine of forum non conveniens requires dismissal of the family's claims. The forum non conveniens analysis calls for the court to consider "(1) whether an adequate alternative forum for the dispute is available and, if so, (2) whether a balancing of private and public interest factors strongly favors dismissal." *Chabad*, 528 F.3d at 950. Here, the district court assumed that Hungary was an adequate alternative forum but found that it "failed to show that the balance of private and public factors favors dismissal in this case." *de Csepel*, 808 F. Supp. 2d at 138. We review the district court's balancing of these factors for "clear abuse of discretion." *Chabad*, 528 F.3d at 950 (internal quotation marks omitted).

In determining that the private interest factors did not favor dismissal, the district court acknowledged Hungary's contention that the events at issue took place in Hungary but reasoned that "many relevant witnesses—namely, plaintiffs themselves as well as Martha Nierenberg—all live outside Hungary." *de Csepel*, 808 F. Supp. 2d at 139. As a result, the district court concluded that "[l]anguage concerns . . . do not shift the balance in favor of Hungary, as relevant depositions and documents would require translation regardless of where this matter is heard." *Id.* With respect to the public interest factors, although Hungary claimed "an interest in having local controversies decided at home" and a superior ability "to interpret and apply both current and historical Hungarian laws," the district court relied, among other public interest factors, on the FSIA's designation of the United States District Court for the District of Columbia as a forum for

25

actions brought under the statute to conclude that dismissal was unwarranted. *Id.*

On appeal, Hungary argues that witnesses and documentary evidence are likely to be located in Hungary and that translations would be needed if trial is held here. Hungary also argues that it has a strong interest in the subject matter of the litigation and a greater familiarity with the applicable laws. But as explained above, the district court considered all of these arguments, and although Hungary obviously disagrees with the district court's analysis, it has failed to show any "clear abuse of discretion." *Chabad*, 528 F.3d at 950 (internal quotation marks omitted).

## III.

This brings us to the family's cross-appeal. Recall that Martha Nierenberg filed a lawsuit in Hungary seeking return of certain pieces of the Herzog Collection and that the Hungarian Metropolitan Appellate Court dismissed the case. The district court granted comity to the Hungarian judgment and dismissed the family's claims to the eleven pieces of artwork at issue in that litigation. This court has never expressly addressed the standard by which we review a district court's decision to grant comity to a foreign judgment, and other courts of appeals have divided as between de novo and abuse of discretion review. *See Asvesta v. Petroutsas*, 580 F.3d 1000, 1009–10 (9th Cir. 2009) (noting divergence among courts of appeals with respect to the proper standard of review). We need not resolve this question, however, because we would reverse under either standard.

The term " '[c]omity' summarizes in a brief word a complex and elusive concept—the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum." *Laker Airways Ltd. v.*

26

*Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984). In determining whether to grant comity to a foreign judgment, we look to the Supreme Court's decision in *Hilton v. Guyot*, 159 U.S. 113 (1895). There, the Court explained that "the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh" based "upon the mere assertion of the party that the judgment was erroneous in law or in fact," provided

> there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect . . . .

*Id.* at 202–03. In addition to the due process concerns identified by *Hilton*, the case law recognizes a narrow "public policy" exception to the doctrine of comity where the foreign judgment is "repugnant to fundamental notions of what is decent and just in the State where enforcement is sought." *Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981) (internal quotation marks omitted).

The district court found no basis for declining to grant comity to the Hungarian judgment, explaining that " '[t]he central precept of comity teaches that, when possible, the decisions of foreign tribunals should be given effect in

27

domestic courts.' " *de Csepel*, 808 F. Supp. 2d at 145 (quoting *Laker Airways*, 731 F.2d at 937). It found unpersuasive the Herzog family's claim that the Hungarian court violated United States public policy by misinterpreting the 1973 Agreement, viewing this argument as nothing more than a request to reexamine the merits of the Hungarian judgment. *Id.* The district court also believed that the family had failed to assert that it lacked "an 'opportunity for a full and fair trial' in Hungary 'before a court of competent jurisdiction, conducting the trial upon regular proceedings.' " *Id.* (quoting *Hilton*, 159 U.S. at 202). Accordingly, the court dismissed the family's claims to the eleven pieces of artwork at issue in the Hungarian proceedings.

On appeal, the family renews their contention that the Hungarian judgment violated the United States' "strong public interest in ensuring that its executive agreements . . . are interpreted correctly" by adopting an "indefensible" construction of the 1973 Agreement under which Martha Nierenberg's claims were deemed barred. Appellees' Br. 74–75. As the district court explained, however, this claim "is precisely the type of 'mere assertion' by a party that a foreign judgment 'was erroneous in law or in fact' that the Supreme Court has held *may not* be grounds for declining to respect the results of foreign judgments." *de Csepel*, 808 F. Supp. 2d at 145 (quoting *Hilton*, 159 U.S. at 203); *see also Medellin v. Dretke*, 544 U.S. 660, 670 (2005) ("It is the long-recognized general rule that, when a judgment binds or is respected as a matter of comity, a 'let's see if we agree' approach is out of order.").

The family also claims that comity is inappropriate because the Hungarian judgment was rendered "as a result of proceedings that were not conducted in accordance with internationally recognized standards of due process or in

28

accordance with international law." Compl. ¶ 79. Granting
comity would certainly be inappropriate if the Hungarian
proceedings in fact failed to satisfy *Hilton*'s requirements of
an "opportunity for a full and fair trial" under "a system of
jurisprudence likely to secure an impartial administration of
justice." *Hilton*, 159 U.S. at 202; *see also Bank Melli Iran v.
Pahlavi*, 58 F.3d 1406, 1410 (9th Cir. 1995) ("It has long
been the law of the United States that a foreign judgment
cannot be enforced if it was obtained in a manner that did not
accord with the basics of due process."); Restatement (Third)
of the Foreign Relations Law of the United States § 482(1)
(1987) ("A court in the United States may not recognize a
judgment of the court of a foreign state if . . . the judgment
was rendered under a judicial system that does not provide
impartial tribunals or procedures compatible with due process
of law . . . ."). The family contends that they "should have
been given the opportunity to develop [the] factual record"
regarding these alleged due process violations "further past
the Rule 12 stage." Appellees' Br. 76. We agree. The
complaint's allegations of due process violations present just
the kind of fact-intensive issues inappropriate for resolution
on a Rule 12(b)(6) motion.

Hungary argues that the family's complaint fails to
specify any "cognizable allegations of wrongdoing" and is
thus "devoid of any allegations sufficient to demonstrate (or
even suggest) that [Martha Nierenberg] was not afforded due
process." Appellants' Reply Br. 55. But "comity is an
affirmative defense" for which the party seeking recognition
of the judgment bears the burden of proof, *see Taveras v.
Taveraz*, 477 F.3d 767, 783 (6th Cir. 2007) (internal quotation
marks and alteration omitted), and although it is certainly
true that plaintiffs must plead the elements of their *claims* with
specificity, they are "not required to negate an affirmative
defense in [their] complaint," *Flying Food Group, Inc. v.*

29

*NLRB*, 471 F.3d 178, 183 (D.C. Cir. 2006) (internal quotation marks omitted); *see also Kim v. United States*, 632 F.3d 713, 718–19 (D.C. Cir. 2011) (concluding that a plaintiff need not plead exhaustion of statutory remedies under the Taxpayer Bill of Rights because failure to exhaust is an affirmative defense); *Davis v. Indiana State Police*, 541 F.3d 760, 763–64 (7th Cir. 2008) (explaining that the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), did not alter the principle that "[c]omplaints need not anticipate, and attempt to plead around, potential affirmative defenses"). Instead, as long as a plaintiff's potential "rejoinder to the affirmative defense [is not] foreclosed by the allegations in the complaint," dismissal at the Rule 12(b)(6) stage is improper. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 466 (4th Cir. 2007) (en banc)*; see also Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998) (explaining that an affirmative defense may only "be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint"). Because nothing in the complaint contradicts the family's claims of due process violations, dismissal at this stage was inappropriate. Of course, we express no opinion as to whether the due process violations alleged by the family actually occurred or, if so, whether they amounted to such "outrageous departures from our notions of civilized jurisprudence" as to require non-recognition of the Hungarian judgment. *Bird v. Glacier Electric Cooperative, Inc.*, 255 F.3d 1136, 1142 (9th Cir. 2001) (internal quotation marks omitted). These issues are properly addressed at summary judgment or trial.

## IV.

For the foregoing reasons, we affirm in part and reverse in part.

*So ordered.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Appellants/Cross-Appellees Republic of Hungary, The Hungarian National Gallery, The Museum of Fine Arts, The Museum of Applied Arts, and The Budapest University of Technology and Economics ("Hungary"), hereby submit this certificate as to parties, rulings, and related cases.

### A.    Parties and Amici

The following parties appeared before the United States District Court for the District of Columbia, and are parties in this Court:

- The Republic of Hungary – as a Defendant/Appellant/Cross-Appellee;

- The Hungarian National Gallery – as a Defendant/Appellant/Cross-Appellee;

- The Museum of Fine Arts – as a Defendant/Appellant/Cross-Appellee;

- The Museum of Applied Arts – as a Defendant/Appellant/Cross-Appellee;

- The Budapest University of Technology and Economics – as a Defendant/Appellant/Cross-Appellee;

- Mr. David L. de Csepel – as a Plaintiff/Appellee/Cross-Appellant;

- Ms. Angela Maria Herzog – as a Plaintiff/Appellee/Cross-Appellant;

- Ms. Julia Alice Herzog – as a Plaintiff/Appellee/Cross-Appellant.

There were no amici or intervenors before the district court, and Hungary is unaware of any amici or intervenors in this Court.

**B.    Rulings Under Review**

Defendants-Appellants/Cross-Appellees seek review of the panel's decision, included in the Addendum.  This appeal is taken from the ruling of the Honorable Ellen S. Huvelle in *David de Csepel, et al. v. Republic of Hungary, et al.*, No. 10-1261, dated September 1, 2011, ECF 33 (Mem. Op.) and ECF 34 (Order), granting, in part, and denying, in part, Appellants/Cross-Appellees' Motion to Dismiss, as amended by the district court's November 30, 2011, Memorandum Opinion and Order, ECF 51, certifying additional issues for appeal, pursuant to 28 U.S.C. § 1292(b), arising from the September 1, 2011, Order.  The opinions on review are available at *David de Csepel, et al. v. Republic of Hungary, et al.*, 808 F. Supp. 2d 113 (D.D.C. 2011) and *David de Csepel, et al. v. Republic of Hungary, et al.*, 2011 U.S. Dist. LEXIS 150696 (D.D.C. Nov. 30, 2011).  No official citation to the November 30, 2011, Memorandum Opinion and Order currently exists.  Hungary intends to ask the Supreme Court to review this Court's decision in *de Csepel v. Republic of Hungary*, 714 F.3d 591 (D.C. Cir. 2013).

## C.    Related Cases

This case has not previously been before this Court or any other Court as defined in Circuit Rule 28(a)(1)(C).[*] Currently, there are two related appeals pending in this Court; *David de Csepel, et al. v. Republic of Hungary, et al.*, No. 12-7025 and *David de Csepel, et al. v. Republic of Hungary, et al.*, No. 12-7026. The appeals were consolidated into the instant appeal, by Order of this Court, dated March 12, 2012, which was filed in Appeal Nos. 11-7096, 12-7025, and 12-7026.

---

[*] The case on review was previously litigated outside the United States. In 1999, Martha Nierenberg, Plaintiff David de Csepel's aunt, filed a lawsuit in Hungary. A final judgment was issued in that case on January 10, 2008. Beyond the instant action, there are no cases pending in the United States between the Appellants and the Appellees.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendants-Appellants/Cross-Appellees make the following disclosures:  The Republic of Hungary is a foreign sovereign.  The Hungarian National Gallery is an agency or instrumentality of Hungary.  The Museum of Fine Arts is an agency or instrumentality of Hungary.  The Museum of Applied Arts is an agency or instrumentality of Hungary.  The Budapest University of Technology and Economics is an agency or instrumentality of Hungary.  All Defendants-Appellants/Cross-Appellees certify that they have no parent corporation and there is no publically held corporation owning 10% or more of any stock in Defendants-Appellants/Cross-Appellees.